FILED
2025 Sep-22 PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

**RICKY RODGERS**

**Plaintiff,**

**v.** **Case No.: 5:24-cv-0243-LCB**

**SOCIAL SECURITY ADMINISTRATION, COMMISSIONER,**

**Defendant.**

**MEMORANDUM OPINION & ORDER**

Ricky Rodgers filed a complaint seeking judicial review of an adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. § 405(g). (Doc. 1). The Commissioner filed an answer and a copy of the administrative record. (Doc. 6). Both Rodgers and the Commissioner have fully briefed the relevant issues, and Rodgers's case is ripe for review. For the following reasons, the Commissioner's final decision is due to be affirmed.

## I. Background

Rodgers protectively filed an application for a period of disability, disability insurance benefits, and supplemental security income on November 20, 2019, alleging disability beginning October 6, 2019, following a motor vehicle accident.

The claim was denied initially and upon reconsideration on September 16, 2020.

Rodgers then requested a hearing before an Administrative Law Judge ("ALJ"),

which was held on November 16, 2021.  Rodgers testified at the hearing, as did an

impartial vocational expert ("VE").  The ALJ subsequently issued an unfavorable

decision.  The Appeals Council granted Rodgers's request for review and remanded

the claim for another hearing, which was held on September 12, 2023.  The ALJ

again issued an unfavorable decision on October 10, 2023.  On January 16, 2024,

the Appeals Council denied Rodgers's request for review, and the ALJ's decision

became the Commissioner's final decision.  This lawsuit followed.

## II.    The ALJ's decision

After the second hearing, the ALJ issued a written opinion explaining her

decision.  (Tr. at 7–38).  In issuing her decision, the ALJ followed the five-step

evaluation process set out by the Social Security Administration.  *See* 20 CFR

416.920(a).  The steps are followed in order and, if it is determined that the claimant

is or is not disabled at a particular step of the evaluation process, the ALJ will not

proceed to the next step.

The first step requires the ALJ to determine whether the claimant is engaging

in substantial gainful activity, which is defined as work involving significant

physical or mental activities usually done for pay or profit.  If a claimant is engaged

in substantial gainful activity, he is not disabled, and the inquiry stops.  Otherwise,

the ALJ will proceed to step two. In the present case, the ALJ found that Rodgers did not engage in substantial gainful activity during the relevant time period. (Tr. at 13). Accordingly, the ALJ moved on to the second step of the evaluation.

At step two, an ALJ is to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR 416.920(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities…." *Id.* If a claimant does not have a severe impairment, he is not disabled, and the inquiry ends. If he does have a severe impairment, the ALJ will proceed to the third step. In the present case, the ALJ found that Rodgers had the following severe impairments: acute cervical fracture status-post anterior cervical discectomy and fusion (ACDF), degenerative disc disease of the lumbar spine, occlusion of the left cervical vertebral artery, supraventricular tachycardia (SVT) with dysautonomia, chronic obstructive pulmonary disease (COPD), mild neurocognitive disorder, generalized anxiety disorder, major depressive disorder, and polysubstance abuse. (Tr. at 13), citing 20 CFR 404.1520(c) and 416.920(c).

At the third step, an ALJ determines whether the claimant's impairments or combination thereof are of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I. If the claimant's impairment or impairments meet or equal a listed impairment, then the claimant is

disabled, and the evaluation ends. Otherwise, the ALJ proceeds to the next step. In this case, the ALJ found that Rodgers's impairments did not meet or equal any of the listed criteria. Specifically, the ALJ reviewed listings 1.15 disorders of the skeletal spine resulting in compromise of nerve roots, 11.04 vascular insult to the brain, 4.05 recurrent arrhythmias, 3.02 chronic respiratory disorders, 12.04 depressive, bipolar, and related disorders, and 12.06 anxiety and obsessive-compulsive disorders. After reviewing the evidence, the ALJ concluded that Rodgers "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 13–14), citing 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. Therefore, the ALJ proceeded to step four.

Step four of the evaluation requires an ALJ to first determine the claimant's residual functional capacity ("RFC"), and whether he has the RFC to perform the requirements of any past relevant work. 20 CFR 416.920(f). The term "past relevant work" means work performed within the last 15 years prior to the alleged date of onset. If a claimant has the RFC to perform past relevant work, he is not disabled, and the evaluation stops. Otherwise, the evaluation proceeds to the final step. In Rodgers's case, the ALJ found that he had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full

> range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can perform occasional postural maneuvers except that he should not climb ropes, ladders, or scaffolds. He should avoid all exposure to unprotected heights. The claimant can understand, remember, follow, and perform simple, routine instructions and tasks; and he can concentrate and remain on tasks for two hours at a time sufficiently to complete an eight-hour workday. He is limited to occasional interactions with coworkers and the general public, and he is limited to jobs with occasional, well-explained, workplace changes.

(Tr. at 16–17). Given this RFC, the ALJ determined that Rodgers was unable to perform his past relevant work as a material handler or pressman. But the ALJ did determine Rodgers was able to perform his past relevant work as a mailroom clerk. (Tr. at 27–28). Specifically, the ALJ accepted the VE's testimony that an individual with Rodgers's RFC could perform the duties of a mailroom clerk as it is generally performed in the national economy. This finding was based in part on testimony from a vocational expert who testified at Rodgers's hearing. (Tr. at 72–77).

Based on the findings above, the ALJ determined that Rodgers was not disabled as defined by the Social Security Administration. (Tr. at 28).

## III. Standard of Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (internal

citation and quotation marks omitted). "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Thus, while the Court must scrutinize the record as a whole, the Court must affirm if the decision is supported by substantial evidence, even if the evidence preponderates against the Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

**IV. Rodgers's Arguments**

Rodgers argues the ALJ's decision about his RFC to perform a range of light work is unsupported by substantial evidence. Rodgers challenges the ALJ's assessment of the record on two grounds. First, Rodgers argues that the ALJ insufficiently evaluated the evidence about pains in his left arm and cervical spine, which is located in the neck. He says these injuries limit his mobility and cause frequent falls. Second, Rodgers maintains that the ALJ cherrypicked evidence about Rodgers's cognitive abilities and mental state. The Court will address each of Rodgers's arguments in turn.

**A. Substantial evidence supports the ALJ's determination regarding Rodgers's pain and mobility.**

Rodgers argues the ALJ insufficiently considered medical observations about weakness and pain taken during medical treatment after his motor vehicle accident.

These include examinations of Rodgers's cervical spine, (*e.g.*, Tr. at 1186, 1192, 1248), and his left extremities ranging from his triceps to his left hand, (*e.g.*, Tr. at 1186, 1193, 1249). Additionally, Rodgers argues the ALJ did not account for advanced disc space height loss in his cervical spine's C6/C7 vertebrae. (Doc. 14 at 9), citing (Tr. at 866). Rodgers also argues that the ALJ did not consider his reduced mobility, use of a cane, or falls. (Doc. 14 at 9–11). For example, he lists generalized falls without his cane in 2020, (Tr. at 1114), and an October 2022 bathtub fall that resulted in a visit to a clinic, (Tr. at 1725). He also relies heavily on the results of a February 2020 evaluation with Dr. Adebimpe Oyowe as proof of his physical incapacity. (Tr. at 1065–72). Dr. Oyowe found Rodgers's neck pain limited his ability to work by hindering his walking, bending, reaching, grasping, or hand rotation. (Tr. at 1070). Dr. Oyowe's ultimate opinion was that Rodgers could walk "occasionally" in an eight-hour workday. (Tr. at 1070). Rodgers argues the ALJ did not sufficiently account for the above evidence.

Despite Rodgers's contentions, the ALJ analyzed the above portions of the record in her analysis, including Rodgers's pain and loss of mobility in his neck and left arm. The ALJ considered the negative results of Rodgers's participation in physical therapy for strength and gait training, noting his decreased range of motion of the cervical spine and decreased strength of all extremities. (Tr. at 20). Conversely, the ALJ also considered the positive results of Rodgers's physical

therapy: near the end of Rodgers's physical therapy, by June 28, 2021, Rodgers reported a fifty percent reduction in pain after exercises. (Tr. at 20), citing (Tr. at 1445). Physical therapy discharged Rodgers a month later, on July 23, 2021, after he missed two appointments. (Tr. at 20), citing (Tr. at 1442). Additionally, despite Rodgers's accusation the ALJ "minimized" Rodgers's advanced disc space height loss at the cervical spine's C6/C7 vertebrae, the ALJ examined both the results of Rodgers's CT scan and X-ray of the C6/C7 vertebrae. (Tr. at 19), citing (Tr. at 1077). Therefore, the ALJ relied on substantial evidence when determining the extent of Rodgers's injury to his cervical spine and left extremities.

The ALJ also considered Rodgers's propensity to fall over, his use of a cane, and Dr. Oyowe's report. For example, the ALJ relied on Rodgers's primary care treatment in July 2020, when the treating physician described him as alert but walking with a stooped gait and cane. (Tr. at 20). Later, at an April 2021 telehealth interview, Rodgers "reported fewer dizzy spells, no syncopal episodes, and no falls." (Tr. at 21). The ALJ also discussed Rodgers's October 2022 fall in his bathtub. (Tr. at 20). Despite earlier observations which suggested immobility, Rodgers was later described as having a "steady gait and full range of motion in his neck" in February of 2023. (Tr. at 20). But then after, in March 2023, Rodgers "reported occasional falls." (Tr. at 22), citing (Tr. at 1848). After weighing these conflicting developments, the ALJ generally noted that "[Rodgers] typically exhibits a normal

gait and normal strength, sensation, and range of motion in his lower extremities, despite his occasional appearances with a cane." (Tr. at 26). Additionally, the ALJ did not find Dr. Oyowe's opinion that Rodgers could only "occasionally" walk in an eight-hour workday persuasive because it was contradicted by Dr. Oyowe's observation that Rodgers exhibited a normal gait. Furthermore, the ALJ found Dr. Oyowe's opinion inconsistent with other evidence that Rodgers typically showed a normal gait and station. For example, the ALJ relied on observations taken during his pain management consultations. (Tr. at 22), citing (*e.g.*, Tr. at 1248, 1265, 1495 ("The patient . . . denied gait abnormality and weakness.")). Consequently, the ALJ relied on substantial evidence in reaching her decision. As a result, the standard of review in this case prohibits the Court from reweighing the evidence in the record. *See Moore*, 405 F.3d at 1211.

**B. Substantial evidence supports the ALJ's determination regarding Rodgers's mental capacity.**

Rodgers also argues the ALJ misconstrued the record as it related to his mental capacity following his motor vehicle accident. (Doc. 14 at 15). Rodgers states that he suffered "hopelessness, crying, low energy, irritability, panic attacks, nervousness, no motivation, loneliness and chronic pain" since the accident. (Doc. 14 at 13), citing (Tr. at 1336). He also says that the ALJ did not sufficiently account for his memory impairment. (Doc. 14 at 13). Specifically, he refers to a March 2020

psychological evaluation where the evaluating doctor, Dr. Jack Bentley, diagnosed Rodgers with PTSD, depressive disorder with anxiety, and a cognitive disorder. (Tr. at 1155). Dr. Bentley also found that Rodgers had severe memory problems, having trouble recalling objects after a five-minute delay and reciting the alphabet. (Tr. at 1155). As a result, Dr. Bentley concluded that Rodgers would be incapable of sustaining simple work-related tasks. (Tr. at 1155). Consequently, Rodgers argues the ALJ should have given more weight to Rodgers's history of memory problems and Dr. Bentley's evaluation. (Doc. 14 at 15).

Despite Rodgers's characterization of the ALJ's decision, the ALJ thoroughly weighed the evidence about Rodgers's mental state. Rodgers underwent behavioral assessments during treatment, and in October 2022, Certified Registered Nurse Practitioner Mandy Laney ("CRNP") described Rodgers as fully communicative, casually groomed, with clear and coherent speech, normal mood, intact language skills, intact associations, logical thinking, intact cognitive function, and intact short- and long-term memory. (Tr. at 24), *see* (Tr. at 1528). Then, in December 2022, CRNP Laney diagnosed Rodgers with depressive disorder, generalized anxiety disorder, and cannabis use disorder, but otherwise found Rodgers was dressed appropriately, neatly groomed, and displayed appropriate behavior. (Tr. at 24), citing (Tr. at 1834–37). In Rodgers's July 2023 visit, CRNP Laney perceived Rodgers's mood as sad or anxious, but also found he had an open and cooperative

attitude, linear thoughts, clear speech, and appropriate eye contact. (Tr. at 24), citing (Tr. at 1780–81). CRNP Laney's observations were substantial evidence in support of the ALJ's determination.

The ALJ also relied on substantial evidence that Rodgers displayed a history of substance abuse and drug-seeking behavior. Rodgers tested positive for amphetamines, benzodiazepines, and cannabis on the day of the motor vehicle accident. (Tr. at 18). At a January 16, 2020, treatment, Rodgers acknowledged using marijuana. (Tr. at 22), citing (Tr. at 1022). Then on July 9, 2020, Rodgers tested positive for marijuana usage. (Tr. at 20), citing (Tr. at 1232). Despite these instances, Rodgers denied using drugs at his ALJ hearings. At the November 16, 2021, ALJ hearing, Rodgers stated he had not used marijuana since Christmas of 2019. (Tr. at 63). Rodgers also denied ever using methamphetamine and stated he had last consumed Adderall, which is an amphetamine, in 2011. (Tr. at 63). At the September 12, 2023, ALJ hearing, Rodgers again denied using marijuana but conceded that he took delta-eight for pain management, which is derived from cannabis plants. (Tr. at 83). Despite Rodgers's answers at the ALJ hearing, the record shows a pattern of drug use.

Additionally, on two occasions, Rodgers unsuccessfully sought controlled substances, and when the treating practitioner refused to prescribe them, Rodgers refused further treatment. On March 9, 2020, the emergency room admitted Rodgers

for neck and back pain. There, he requested narcotic pain medication, which doctors refused to prescribe.   Instead, they offered Flexeril and Mobic, which Rodgers declined and told doctors he would not fill if prescribed.  (Tr. at 18–19), citing (Tr. at 1090).  Then on June 17, 2020, Rodgers visited a psychiatrist and requested Xanax for anxiety.   When the psychiatrist refused to prescribe it, Rodgers declined to consider another medication and stopped cooperating with the evaluation.   The treating psychiatrist noted Rodgers appeared "very goal oriented" and expressed concern that Rodgers was drug-seeking. (Tr. at 23), quoting (Tr. at 1205).  Rodgers's history of drug use and drug-seeking behavior is substantial evidence supporting the ALJ's determination.

Rodgers's briefing blames the ALJ for "ignoring or misconstruing significant portions of the record."  (Doc. 14 at 15).  This is not the case; the ALJ reached her conclusions after combing through a dense—and at times conflicting—record.  This Court reviews the ALJ's decision under the substantial evidence standard, which is "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Winschel*, 631 F.3d at 1178 (internal citation and quotation marks omitted).  But this Court "may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner."  *Id.*  Here, where there is a lengthy record with many treating practitioners over the course of several years, the Commissioner must weigh

inconsistent evidence and fluctuating observations. Rodgers has presented his case not once before an ALJ, but twice. Accordingly, he has had two opportunities to present the evidence and for an ALJ to weigh the evidence presented. District Court review is not an invitation for a third opportunity to reweigh the evidence in the record. After reviewing ALJ's decision, the Commissioner's use of the record in coming to a decision satisfies the substantial evidence standard.

**V. Conclusion**

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**DONE** and **ORDERED** this September 22, 2025.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE